**Deborah M. MARSHALL, Individually and as Personal Representative of the Heirs and Estate of Frederick A. Marshall, Jr., Deceased, Plaintiff,**

**v.**

**The CELOTEX CORPORATION, Eagle-Picher Industries, Inc., Armstrong World Industries, Inc., Raymark Industries, Inc., Raymark Corporation, H.K. Porter Company, Inc., Southern Textile Corporation, GAF Corporation, Fibreboard Corporation, Keene Corporation, Keene Building Products Corporation, Pittsburg Corning Corporation, Forty-Eight Insulation, Inc. and Nicolet, Inc., Defendants.**

Civ. A. No. 82–73643.

United States District Court,
E.D. Michigan, S.D.

Jan. 14, 1987.

Robert E. Sweeney, Jr., Robert E. Sweeney, Sr., Cleveland, Ohio, Kenneth B. Williams, East Lansing, Mich., for plaintiff.

Ronald E. Wagner, Kitch, Saurbier, Drutchas, Wagner & Kenney, Detroit, Mich., for defendants.

## OPINION

FEIKENS, District Judge.

Plaintiff seeks to recover damages arising out of the death of her husband, Frederick Marshall ("Marshall"), allegedly as a result of his exposure to asbestos products. Before me are defendants' motions for summary judgment. They challenge the validity or applicability to this suit of plaintiff's several "alternative" theories of liability.

I have subject matter jurisdiction based on diversity. 28 U.S.C. § 1332.

*Background*

Marshall died in 1981 of peritoneal mesothelioma. Plaintiff alleges that his death was the result of his exposure to asbestos products during his employment at the U.S. Naval Station in Guantanamo Bay, Cuba, from 1967–1971. He worked there as a pipe-coverer and ship-fitter and handled various thermal insulation products which contained asbestos. Plaintiff has named fourteen defendants in this action, claiming that they provided these products to the Navy.

By pretrial order of November 14, 1985, plaintiff was directed to notify each defendant of Marshall's use of their product by January 21, 1986. Plaintiff now admits that she is unable to directly identify any product that Marshall used. During his life, Marshall never identified the manufacturers of the products he used. In addition, Marshall's co-workers indicated that these products arrived in bulk, in plain wrapper, and without any product identification markings.

Plaintiff has discovered that the Navy does not maintain specific records identifying manufacturers of products used at the Guantanamo Bay base. However, she was able to obtain the Navy's Qualified Products Lists ("QPL"), which identify the possible providers of any product to the Navy. The QPLs for the relevant products, pipe and block insulation, list eight potential providers during the relevant time period, 1967–1971. Plaintiff has named six of these possible manufacturers as defendants in this case: Celotex, GAF, Fibreboard, Keene, Pittsburgh-Corning, and Nicolet. (Plaintiff concedes that the remaining eight of the fourteen named defendants do not appear on any relevant QPL and should be dismissed.) There is no further identification as to which manufacturer actually supplied products to the Guantanamo Bay site.

■ The threshold requirement of any products liability action is identification of the injury-causing product and its manufacturer. *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164, *cert. denied*, 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984). Defendants argue that they are entitled to summary judgment because this "identification requirement," the burden of proof as to causation, is not met. Because she has named "substantially all" of the possible manufacturers as defendants, plaintiff seeks to circumvent the identification requirement. She urges me to adopt "alternative theories" of liability which she claims would shift the burden of proof as to causation to the defendants. These theories include (1) alternative liability, (2) market share liability, (3) concert of action liability, and (4) enterprise liability.

Michigan law applies in this diversity case. The Michigan Supreme Court has applied alternative liability and concert of action theories in a case involving the drug diethylstilbesterol ("DES"). *Abel, supra.* I must decide if these theories are applicable in the asbestosis context. The Michigan Supreme Court has not adopted the theories of enterprise liability or market share liability. Therefore, I must decide whether that court would adopt these theories in the present case. *Bailey v. V & O Press, Inc.*, 770 F.2d 601 (6th Cir.1985). (In the absence of a definitive ruling on a question of substantive law, a federal court sitting in diversity must predict how the highest state court would rule on that issue.).

*Alternative Liability*

Plaintiff first urges application of alternative liability. This theory is incorporated in § 433B(3) of the Restatement (Second) of Torts, which provides:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

*See also Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948).

The Michigan Supreme Court adopted alternative liability in *Abel, supra,* which involved a suit against a large number of drug manufacturers for injuries caused by DES. The court, acknowledging that it was "fashioning and approving a new DES-unique version of alternative liability," held that the following criteria must be met before the identification burden could be shifted to the defendants: (1) All defendants must have acted tortiously; (2) Plaintiff must have been harmed by the conduct of one of the defendants (Plaintiffs must, therefore, bring before the court all possible defendants); (3) Plaintiff is unable to identify which defendant caused the injury. *Abel, supra,* 418 Mich. at 331–332, 343 N.W.2d 164.

Plaintiff admits that the second requirement is not met—not all possible defendants are before the court. (Plaintiff's Supplemental Brief at pp. 8–9). At least two manufacturers on the QPL, Owens-Corning and Johns-Manville, are not named as defendants. This precludes application of alternative liability. *Vigiolto v. Johns-Manville,* 643 F.Supp. 1454, 1457 (W.D.Pa. 1986). The court in *Vigiolto* rejected application of alternative liability in an asbestos case identical to the case before me, concluding:

> The *sine qua non* of § 433B(3) liability [alternative liability] is proof that harm has been caused to plaintiff by *at least one* of the multiple [defendants] sued by the plaintiff. ... if plaintiff cannot prove who caused his injuries and does not name as defendants *all* who *possibly could have,* plaintiff has not proved that *at least one* of the named defendants caused the harm. ... the plaintiff must name as defendants all who could have caused the complained of injury.

*Id.* at 1457 (emphasis in original).

Plaintiff seeks a modification of the requirement that all defendants must be named. Such a modification no longer describes alternative liability, but market share liability, discussed *infra.*

*Market Share Liability*

Plaintiff also urges me to adopt the "market share" theory of liability, which was first applied in a DES case, *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980). Market share liability is an extension of alternative liability, and likewise serves to shift the identification burden to the defendants. Unlike alternative liability, market share liability does not require joinder of all possible defendants who could have caused plaintiff's injury. Instead it requires joinder of a sufficient number of possible defendants to insure that a "substantial share of the market" for the allegedly harmful product is represented. *Sindell, supra,* 163 Cal.Rptr. at 145, 607 P.2d at 937. *See also* Prosser and Keeton, Torts (5th Ed.) § 103 (1984).

The Michigan Supreme Court has not adopted market share liability. However, plaintiff asserts that it is consistent with the court's ruling in *Abel.* Plaintiff points to the court's concluding statement: "It is not this Court's intention to be unreceptive to developing theories in the everchanging matrix of law." *Id.* 418 Mich. at 337, 343 N.W.2d 164. The court in *Abel* also noted that possible modification of alternative liability was suggested by the very basis of alternative liability, Restatement of Torts (Second) § 443B(3). *Abel, supra,* at 331–332, n. 14, 343 N.W.2d 164. Section 433B(3), comment h, states that the rule outlining alternative liability "is not intended to preclude possible modification if such situations call for it."

■ I find that asbestosis litigation is an inappropriate area in which to extend market share liability. Market share liability was developed for a fungible product, the drug DES. *Sindell, supra,* 163 Cal.Rptr. at 144, 607 P.2d at 936. "Put simply, an asbestos case is not a DES case, for asbestos is not like DES." *Hannon v. Waterman,* 567 F.Supp. 90, 92 (E.D.La.1983). This difference was crucial to the court in *Vigiolto:*

> [T]here are inherent differences between asbestos products and the drug DES, for which the market share theory was developed, which further make the market share theory extremely difficult to apply in asbestos-injury cases. DES was produced by hundreds of companies pursuant to one formula. As a result, all DES had identical physical properties and chemical compositions and, consequently, all DES prescribed to pregnant women created the same risk of harm to the women's female offspring. ... Asbestos products, on the other hand, have widely divergent toxicities, with some asbestos products presenting a much greater risk of harm than others. ... This divergence is caused by a combination of factors, including: the specific type of asbestos fiber incorporated into the product; the physical properties of the product itself; the percentage of asbestos used in the product.

*Id.* at 1463, *quoting Celotex Corp. v. Copeland,* 471 So.2d 533, 537–538 (Fla.1985). The application of market share liability would raise "serious questions of fairness due to the fact that different manufacturers' asbestos products differ in degrees of harmfulness." *Blackston v. Shook & Fletcher Insulation,* 764 F.2d 1480, 1483 (11th Cir.1985), *citing Starling v. Sea-*

*board Coast Line Railroad,* 533 F.Supp. 183, 190 (S.D.Ga.1982).

Courts commonly give two other policy reasons for refusing to impose market share liability in asbestos cases:

> First, elimination of a causation requirement would render every manufacturer an insurer not only of its own products, but also of all generically similar products manufactured by its competitors.... Second, expanding culpability of asbestos manufacturers could reduce the ability to spread losses by insurance and otherwise distribute risk.

*Blackston, supra,* at 1483; *Vigiolto, supra,* at 1464; *Starling, supra,* at 190. Added to these policy considerations is the practical difficulty of defining the relevant markets for asbestos products. *Vigiolto, supra,* at 1464, *citing In re Related Asbestos Cases,* 543 F.Supp. 1152, 1158 (N.D.Cal. 1982).

■ Even if market share liability were generally applicable to asbestos cases, a key requirement of the theory is not present in the case before me. It requires that the named defendants represent a "substantial share of the market" for the harmful product. Plaintiff has named six of eight manufacturers of the relevant QPLs. She maintains that she has named six of seven "possible" defendants, and therefore eighty-five percent (85%), a substantial share, of the appropriate market.[1] However, plaintiff incorrectly equates the percentage of possible defendants who are named in the complaint with the share of the market which they represent. In fact, nothing is known about the respective market shares of each defendant on the QPL. There is no evidence, other than plaintiff's bare assertion, that the six named defend-

---

1. Plaintiff's position is that all of the potential defendants in this case are the manufacturers listed on the Navy's QPLs for the products used by Marshall. Plaintiff asserts that she has named six of the eight manufacturers on these QPLs. Plaintiff incorrectly reasons that one of the eight manufacturers listed, but one not

named as a defendant, Johns-Manville, should not figure into the determination of market share liability because it is in bankruptcy. Thus, she uses the figure six of seven "possible" defendants. Plaintiff's calculations highlight the difficulty of defining the relevant market in

ants represent a "substantial share" of the relevant market.[2]

## Concert of Action Liability

■ Plaintiff attempts to state a claim on a theory of concert of action. To avoid summary judgment, plaintiff argues that *Abel, supra,* 418 Mich. at 338, 343 N.W.2d 164, requires only that plaintiff allege that the defendants were jointly engaged in tortious activity. The complaint states in this regard "defendants as a group supplied virtually all of the asbestos products to which [Marshall] was exposed," that Marshall's death "was proximately caused by his exposure to asbestos products designed, manufactured and sold by defendants," and that "defendants should be 'jointly and severally' liable." (Plaintiff's Complaint at pp. 7–8).

A case decided in the Michigan Court of Appeals subsequent to *Abel* is *Cousineau v. Ford Motor Company,* 140 Mich.App. 19, 363 N.W.2d 721 (1985). That case is authority for the teaching that in addition to being required to plead alleged tortious activity on the part of the defendants, plaintiff must also allege and prove that the defendants' breach proximately caused plaintiff's asbestosis.

*Abel* and *Cousineau* do not do away with the need to allege and prove cause. *Abel* restates the known proposition that defendants who jointly acted tortiously can all be held liable for injury proximately resulting from that conduct.

Accordingly, at this stage I find it difficult to grant defendants' motion for summary judgment as to the concert of action theory only. I propose, rather, to hold a hearing at which I will require plaintiff to make an offer of proof as to causation. It may be that there is no genuine issue of material fact as to causation and, in this way, I will be informed.

## Enterprise Liability

■ Plaintiff finally urges me to adopt "enterprise liability," which was first adopted in *Hall v. E.I. DuPont De Nemours & Co.,* 345 F.Supp. 353 (E.D.N.Y. 1972). Plaintiff incorrectly maintains that the court in *Abel* adopted enterprise liability. (The court specifically found that the theory was not recognized in Michigan, and declined to consider it. *Abel, supra,* 418 Mich. at 337, 343 N.W.2d 164.) Enterprise liability exists where it can be proved that plaintiff's injury was caused by at least one of a group of manufacturers of a particular product, where identification of the specific manufacturer of that product is not possible, and where the manufacturers collectively adhere to an unreasonable safety standard regarding the product. *Vigiolto, supra,* at 1457.

■ Enterprise liability is an extension of concert of action liability, and has as its focus the "joint control of risk" by a group of manufacturers in an industry. *Hall, supra,* at 371–378. It is inapplicable to the present case for two reasons. First, *Hall* adopted enterprise liability to establish joint liability, not to shift the burden of proof on causation. Along with enterprise liability, *Hall* adopted alternative liability or an early version of market share liability to ease the plaintiff's causation burden. *Id.* at 378–380. I have already found that alternative liability and market share liability are not applicable in the present case.

asbestos cases. In any event, two defendants are not named.

**2.** At the hearing on September 8, 1986, I instructed each party to supply additional information as to the relevant asbestos market. I requested that defendants provide information as to the market share of each of the eight defendants listed on the QPL, specifically that of Johns-Manville, which is alleged to have a major market share. Defendants contacted the Navy, but informed me by letter of December 11, 1986 that they were unable to obtain this information.

I also requested that plaintiff provide information as to whether Marshall was exposed to asbestos products other than those named, such as thermal adhesives. Additional products would have expanded the number of possible defendants and reduced the probability that a substantial share of the market was represented by the named defendants. Plaintiff has requested this information from the Navy, but she has not received a response.

This distinguishes the present case from *Hall.*

In addition, even if enterprise liability alone shifts the burden of causation, as some courts have assumed, the main requirement of enterprise liability is not met in the present case. As the court in *Vigiolto* recently concluded after an extensive analysis of enterprise liability:

> [W]e believe that the theory of enterprise liability, as announced in *Hall,* is wholly dependent upon either the informed exercise of control over the uniform practices of a given industry by a small number of manufacturers or the delegation by them of safety functions to a trade association, and that a plaintiff who has failed to allege that either of these conditions exist will not be permitted to proceed under this theory.

*Id.* at 1460. In the case before me, plaintiff simply does not allege either joint control of risk or delegation of safety functions required by enterprise liability.

I find that enterprise liability is therefore inappropriate in the present case. This is clearly the opinion of other courts that have addressed this issue. *Thompson v. Johns-Manville Sales Corp.,* 714 F.2d 581, 583 (5th Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984). ("Both [enterprise liability and market share liability] represent radical departures from traditional theories of tort liability."); *Blackston, supra,* at 1483; *Vigiolto, supra,* at 1459; *Lillge v. Johns-Manville,* 602 F.Supp. 855, 856 (E.D.Wis.1985); *Hannon v. Waterman, supra,* at 92; *Starling, supra,* at 186.

*Conclusion*

I find that three of the four alternative theories of liability that plaintiff urges me to adopt are inapplicable to the present case.

Accordingly, defendants' motions for summary judgment as to alternative liability, market share liability and enterprise liability are GRANTED.

Pending a further hearing on concert of action liability, defendants' motion for summary judgment as to that theory is held in abeyance.

An appropriate order may be submitted.