# IN THE SUPREME COURT OF IOWA

No. 20–0343

Submitted March 24, 2021—Filed June 30, 2021

**THOMAS LUKKEN,**

Appellant,

vs.

**KORBY L. FLEISCHER,** individually and d/b/a **MT. CRESCENT SKI AREA; SAMANTHA FLEISCHER,** individually and d/b/a **MT. CRESCENT SKI AREA; MT. CRESCENT SKI AREA,** an unknown business entity; **SAFEHOLD SPECIAL RISK, INC.,** an Illinois corporation; **CHALLENGE QUEST, LLC,** an Oklahoma Corporation d/b/a **CHALLENGE QUEST, LLC;** and **KIRK GREGORY ENGINEERING, P.C.,** a Texas Corporation; **KG STRUCTURAL SOLUTIONS, LLC,** a Texas Corporation; and **ATLAS ENGINEERING, LLC,** a Nebraska Corporation,

Appellees.

---

Appeal from the Iowa District Court for Pottawattamie County, James S. Heckerman, Judge.


The plaintiff appeals the district court's grant of summary judgment in favor of the defendants relating to claims for injuries suffered in a zip-lining accident. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**


McDermott, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Mansfield, McDonald, and Oxley, JJ., joined. Appel, J., filed an opinion concurring specially.

Matthew A. Lathrop (argued) of Law Office of Mathew A. Lathrop, Omaha, Nebraska, and Robert M. Livingston of Stuart Tinley Law Firm, LLP, Council Bluffs, for appellant.

Thomas Henderson (argued) and Peter J. Chalik of Whitfield & Eddy, P.L.C., Des Moines, for Mt. Crescent appellees.

Joshua S. Weiner (argued) and Robert M. Slovek of Kutak Rock LLP, Omaha, Nebraska, for appellee Challenge Quest, LLC.

**McDERMOTT, Justice.**

Thomas Lukken stepped off an elevated platform and sped down a zip line at the Mt. Crescent Ski Area. An employee at the end of the zip line had failed to reset the zip line's braking system after the previous rider exited. By the time the employee realized his mistake, it was too late. Lukken slammed into a wooden pole at the base of the zip line and fractured his neck. He sued the zip line's original designer and its owner. The district court dismissed the claims against the zip line's designer primarily based on the fact that the braking system that failed to stop Lukken had been completely replaced by a different supplier before the incident. And the district court dismissed the claims against the zip line's owner based on a liability waiver that Lukken signed before riding. Lukken appeals.

I.

Double Diamond, Inc. d/b/a Mt. Crescent Ski Area (Mt. Crescent) operates a skiing and sledding business in winter months and offers other outdoor recreational activities, including zip lining, in warmer months. The zip line begins on a twenty-four-foot-high platform atop the ski hill. Harnessed riders travel down the zip line reaching speeds of up to forty miles per hour before landing on a lower thirty-three-foot-high landing platform at the bottom of the hill. The zip line extends 1576 feet from start to finish.

In April 2014, Mt. Crescent contracted with Challenge Quest, LLC, to build and install the zip line. Challenge Quest designed the zip line to have enough slack so that riders would nearly run out of momentum before reaching the landing platform. To bring riders nearing the landing platform to a complete stop, a small device with wheels that rode on top of the zip line and connected the rider's harness to the zip line (referred to as

a "trolley") made contact with a padded brake block. The brake block connected to a rope-pulley system. An operator on the landing platform held onto a rope connected to the pulley and applied manual resistance to bring riders to a complete stop. This rope-braking feature slowed riders as the rope ran through the operator's hands, with operators tightening or releasing their hold as needed to apply the appropriate amount of friction. Because slack in the zip line could cause riders to slide back away from the landing platform once a rider's forward momentum stopped, the brake block also featured a capture arm that prevented riders from backsliding. The operator used the same rope-pulley system to pull stopped riders all the way onto the landing platform. After an operator unhooked a completed rider on the landing platform, the operator would use the same rope-pulley system to manually move the brake block back out for the next rider.

Challenge Quest completed construction of the zip line in August 2014. It then provided, as contemplated by the parties' contract, a four day "site specific high technical training for full time staff," including training on the braking system, after which it turned full control of the zip line over to Mt. Crescent. After the zip line opened to the public, Mt. Crescent's operators in several instances failed to sufficiently slow riders using grip friction on the rope to control the brake block. Riders arrived at the landing platform at speeds in excess of six miles per hour, the maximum recommended by a trade association called the Association for Challenge Course Technology (ACCT), which develops safety standards for zip line courses. In some cases, these riders collided with the Mt. Crescent employees engaged in stopping them. A handful of injuries resulted, the most serious apparently being an injured ankle.

Mt. Crescent decided to consult with a different contractor about a different braking system than the original one Challenge Quest had installed. This new contractor, Sky Line, inspected Mt. Crescent's zip line and recommended a "zipSTOP" braking system. Mt. Crescent had initially considered a zipSTOP braking system as part of the zip line that Challenge Quest designed but decided against it. Mt. Crescent agreed with Sky Line's recommendation and hired Sky Line to install the zipSTOP system on its existing zip line. Sky Line completed the installation in July 2016. Mt. Crescent informed Challenge Quest of none of this.

Like the original braking system, the zipSTOP braking system also uses a brake block to bring riders to a complete stop. But instead of rope pulleys controlling the brake block using an operator's hand resistance, the brake block uses a magnetic-resistance wheel to bring riders to a complete stop. The brake block automatically moves back to the correct position on the zip line in preparation for the next rider, but an operator must manually redeploy it before it will move.

Lukken rode Mt. Crescent's zip line in October 2016 with the zipSTOP braking system in place. The Mt. Crescent employee on the landing platform forgot to redeploy the brake block after the rider ahead of Lukken finished. Lukken was already whizzing down the zip line toward the landing platform by the time the operator realized his mistake. The operator's tardy redeployment of the zipSTOP braking system didn't permit enough time for it to stop Lukken, and he crashed into a wooden pole at the base of the zip line and suffered a neck fracture.

Before riding on the zip line, Lukken signed a release and waiver-of-liability agreement in favor of Mt. Crescent. It stated in relevant part:

> I am aware and fully understand that these activities are very dangerous. They involve the risk of damage, serious injury and death, both to myself and to others.

I understand that there are many potential causes for property damage, serious injury and death at Mt Crescent Ski Area including the negligence of Mt Crescent Ski Area, its owners, agents, employees, volunteer staff, rescue personnel, and equipment as well as my own negligence and the negligence of others.

In consideration of being permitted to participate in the activities offered at Mt Crescent Ski Area I hereby agree to release, waive, discharge, and covenant not to sue Mt Crescent Ski Area, its owners, agents, employees, volunteer staff, or rescue personnel as well as any equipment manufacturers and distributors involved with the Mt Crescent Ski Area facilities from any and all liability from any and all loss or damage I may have and any claims or demands I may have on account of injury to my person and property or the person and property of others, including death, arising out of or related to the activities offered at Mt Crescent Ski Area whether caused by the negligence of Mt Crescent Ski Area, its owners, agents, employees, volunteer staff, rescue personnel, equipment manufacturers, or distributors or otherwise.

. . . .

In consideration of being permitted to participate in the activities offered at Mt Crescent Ski Area, I agree that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to any and all acts of negligence by Mt Crescent Ski Area, its owners, agents, employees, volunteer staff, rescue personnel, and equipment manufacturers, and distributors, including negligent rescue operations and is intended to be as broad and inclusive as permitted by Iowa law and that if any portion is held invalid, it is agreed that the balance shall continue in full legal force and effect.

He filed suit against Mt. Crescent (and related individuals and entities alleged to own it) and Challenge Quest (and related entities alleged to have participated in the zip line's design and construction), pleading causes of action for negligence and strict liability, and requesting punitive damages.

The district court granted summary judgment in favor of Challenge Quest, holding that it breached no duty to Lukken and that it didn't cause Lukken's injuries. The district court reasoned that Challenge Quest owed no duty to Lukken because it had completed its work under its contract

and transferred control of the zip line to Mt. Crescent by the time of the incident, and, further, that its actions were not the "cause" of Lukken's injuries because it didn't install the allegedly defective braking system in place when Lukken was injured.

The district court also granted summary judgment in favor of Mt. Crescent, holding the waiver dispositive of the claims. The district court reasoned that Iowa courts consistently uphold exculpatory agreements and that the waiver at issue contained language sufficiently "clear and unequivocal" to demonstrate that Lukken understood he was waiving future claims of negligence. The court held that the express language of waiving "any and all negligence" waived all of Lukken's negligence claims, including his claim for gross negligence. The district court declined to hold the waiver unenforceable based on public-policy grounds and held that the waiver wasn't preempted by statute.

Lukken appeals each of the district court's summary judgment rulings.

II.

We turn first to Lukken's claims against Challenge Quest. Lukken pleaded claims against Challenge Quest under theories of both negligence and strict liability. Yet his summary judgment and appellate briefing contain no separate legal arguments distinguishing the two theories. He cites no products liability law despite the fact that his petition alleges claims for strict liability based on design defects in the zip line. He instead focuses solely on traditional negligence principles. We will thus analyze Challenge Quest's liability through the lens of a negligence claim.

To maintain a claim for negligence, Lukken must prove that Challenge Quest owed a duty to protect him from the harm he suffered. *See Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009). Lukken

contends that Challenge Quest owed a bevy of duties to Mt. Crescent, including a duty (1) to design and construct a zip line that complied with industry standards, (2) to provide Mt. Crescent appropriate instruction on how to operate the zip line, (3) to address Mt. Crescent's safety concerns about the zip line, (4) to ensure that Mt. Crescent had procedures in place to train new employees, and (5) to address safety issues with Mt. Crescent arising in future safety inspections. Lukken argues that Challenge Quest owes each of these duties to Mt. Crescent and, based on the risk of physical harm to Mt. Crescent's zip line riders, these duties extend to Lukken as well.

Whether a defendant owes a duty of care under particular circumstances is a question of law for the court. *Hoyt v. Gutterz Bowl & Lounge L.L.C.*, 829 N.W.2d 772, 775 (Iowa 2013). The district court in granting summary judgment held that Challenge Quest owed Lukken no duty of care for the injury he sustained. We review the district court's holding for correction of legal error. *Lewis v. Howard L. Allen Invs., Inc.*, 956 N.W.2d 489, 490 (Iowa 2021).

The central issue here is the scope of Challenge Quest's duty in regard to the braking system after the braking system had been replaced without Challenge Quest's involvement. We have reiterated that, under the Restatement (Third) of Torts, control remains an important consideration in whether a duty exists and liability normally follows control. *See McCormick v. Nikkel & Assocs., Inc.*, 819 N.W.2d 368, 371–73 (Iowa 2012). In *McCormick v. Nikkel & Associates, Inc.*, we held as a matter of law that a subcontractor owed no duty to assure the safety of a jobsite once it locked up the switchgear and transferred control back to the contractor. *Id.* at 373–75. So too here, once Mt. Crescent decided to replace the braking system, any machine- or human-related flaws in that

system ceased to be Challenge Quest's responsibility. Challenge Quest's braking system didn't fail; it no longer existed. Challenge Quest likewise had no connection to the actions of Mt. Crescent's employee who failed to reset the brake in time to stop Lukken. The employee didn't work for Mt. Crescent when Challenge Quest conducted its four-day technical training for Mt. Crescent employees prior to Mt. Crescent opening the course to the public. Challenge Quest had no role in the employee's hiring, supervision, or instruction.

And Challenge Quest neither designed nor constructed the braking system that the employee failed to reset when Lukken rode the zip line. By that time, Sky Line's zipSTOP braking system had replaced Challenge Quest's original system. Challenge Quest owed no duty of care to prevent Mt. Crescent from changing the braking system. Because Challenge Quest owed no duty of care associated with the zip line's braking system after its own braking system had been uninstalled, no cause of action for negligence exists as a matter of law, and the district court thus properly granted summary judgment in Challenge Quest's favor.

Lukken argues more specifically that Challenge Quest should have incorporated an emergency brake as part of its original braking system. But this argument fails, too, based on the replacement of the braking system and Challenge Quest's lack of any control at that point. When Mt. Crescent decided to install a different braking system, it became the responsibility of Mt. Crescent and Sky Line to assure the safety of that system. Challenge Quest's original braking system (without an emergency brake) apparently resulted in some minor mishaps until it was replaced in July 2016. Sky Line's replacement braking system (without an emergency brake) had the potential to result in a more serious accident in the event of an operator's error. It would be unfair to make Challenge Quest legally

responsible for this replacement system. *See Huck v. Wyeth, Inc.*, 850 N.W.2d 353, 381 (Iowa 2014) (reaffirming the "long-standing" rule that requires the plaintiff "to prove the defendant manufactured or supplied the product that caused her injury, and [declining] to extend the duty of product manufacturers to those injured by use of a competitor's product"). In this case, to the extent any product failed, it wasn't Challenge Quest's product. *Cf. Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 825 (Iowa 2000) (en banc) ("[T]o establish assembler liability, the plaintiff must show that the assembler actually sold or otherwise placed the defective product on the market. *Baughman*[ *v. Gen. Motors Corp.*, 780 F.2d 1131, 1132–33 (4th Cir. 1986)] (refusing to hold truck manufacturer liable for defective wheel rim that was placed on vehicle after sale and that manufacturer did not supply); *Exxon*[ *Shipping Co. v. Pac. Res., Inc.*, 789 F. Supp. 1521, 1522–23, 1527 (D. Haw. 1991)] (refusing to hold designer of mooring terminal liable for defective replacement chain).") That Lukken claims the new, different product was similarly defective does not provide him a basis to pursue Challenge Quest for a defect in a product that Lukken never used and that didn't injure him. *See* Restatement (Third) of Torts: Prod. Liab. § 15 cmt. *b*, illus. 2, at 232 (Am. L. Inst. 1998).

Lukken also contends that Challenge Quest's zip line design defects caused riders to reach speeds in excess of ACCT's standards, which left the braking system unable to safely stop him. But the record demonstrates that Sky Line independently examined the existing zip line, recommended the zipSTOP braking system, and (at Mt. Crescent's direction) installed it. As the district court correctly found, the actions of Sky Line and Mt. Crescent cut off Challenge Quest's liability. *See McCormick*, 819 N.W.2d at 374 (noting that the party in control "is best positioned to take precautions to identify risks and take measures to

improve safety"). In this case, when Mt. Crescent scrapped Challenged Quest's original braking system and installed Sky Line's zipSTOP braking system, Challenge Quest was relieved of any liability associated with insufficient stopping capacity or other defects in its original braking system.

Lukken further claims that Challenge Quest breached a duty to provide Mt. Crescent information, training, and policies to ensure Mt. Crescent's safe ongoing operation of the zip line. Lukken asserts that had Challenge Quest instructed Mt. Crescent on safety procedures that included, for instance, operational redundancies or checklists, Mt. Crescent might have ensured the braking system was properly deployed and cross-checked before Lukken ever started down the zip line. But this claimed duty on Challenge Quest fails for reasons inherent in the different braking systems that were installed. The original braking system required an employee's active, manual stopping efforts to ensure riders stopped at the landing platform. Yet the zipSTOP system stops riders through an automated brake that requires no similar manual exertion. Challenge Quest had no reason to provide the type of instruction or policies that would have caused Mt. Crescent's employees to remember to redeploy an automated braking system that, at the time, didn't exist on this zip line. Challenge Quest trained Mt. Crescent's employees on how to stop a rider using the original manual stopping method; we see no basis to impose on Challenge Quest some requirement to provide instruction or procedures on operating a distinct braking system that hadn't been installed. On these facts, Challenge Quest had no duty to provide training or policies on the safe operation of a braking system that relied on a completely different stopping mechanism and that required completely different actions by Mt. Crescent's employees.

We thus affirm the district court's grant of summary judgment in favor of Challenge Quest.

### III.

We turn to the dismissal of Lukken's negligence claim against Mt. Crescent. The district court found that the waiver Lukken signed before riding the zip line was "broad in its inclusiveness and contained clear and unequivocal language sufficient to notify Plaintiff that by signing the document, he would be waiving all future claims for negligence against Defendants." Lukken argues that even if the waiver's language could be considered "clear and unequivocal," Mt. Crescent's negligence went beyond ordinary negligence and into the realm of gross negligence. He argues that the gross negligence alleged in this case involves conduct more culpable than the inadvertence or inattention of ordinary negligence and that, as a matter of public policy, Iowa courts should not enforce clauses that exculpate parties from grossly negligent conduct.

Exculpatory clauses, sometimes referred to as "hold harmless" clauses, relieve parties from responsibility for the consequences of their actions. "[W]e have repeatedly held that contracts exempting a party from its own negligence are enforceable, and are not contrary to public policy." *Huber v. Hovey*, 501 N.W.2d 53, 55 (Iowa 1993). An enforceable waiver must contain "clear and unequivocal language" notifying a casual reader that by signing, she agrees to waive all claims for future acts or omissions of negligence. *Sweeney v. City of Bettendorf*, 762 N.W.2d 873, 878–79 (Iowa 2009). An intention to absolve a party from all claims of negligence must be clearly and unequivocally expressed in the waiver. *Id.* at 878–79; *see also Baker v. Stewarts' Inc.*, 433 N.W.2d 706, 709 (Iowa 1988) (stating that an intent "to absolve the establishment from liability based upon the

acts or omissions of its professional staff . . . must be clearly and unequivocally expressed").

Exculpatory clauses reside at the intersection of tort law and contract law. Under tort law, courts generally permit a party to whom a duty of care is owed to pursue damages against another for acts that breach that duty if those acts were the factual cause of the harm and within the other party's scope of liability. *See Thompson*, 774 N.W.2d at 837. But under contract law, "parties of full age and competent understanding must have the greatest freedom of contracting, and contracts, when entered into freely and voluntarily, must be upheld and enforced by the courts." 5 Richard A. Lord, *Williston on Contracts* § 12:3, at 862–870 (4th ed. 2009). Not enforcing exculpatory clauses advances the interests of tort law (deterring unsafe conduct and compensating accident victims) but abridges parties' power to contract; enforcing exculpatory clauses advances the parties' power to contract but abridges tort remedies.

Courts attempt to strike a balance by not enforcing exculpatory contracts that contravene public policy. *See Wunschel L. Firm, P.C. v. Clabaugh*, 291 N.W.2d 331, 335 (Iowa 1980). Admittedly, courts have struggled to articulate a predictable framework for parties to anticipate which agreements will contravene public policy in a future given case and which will not. We have stated in general terms that courts should not enforce a contract that "tends to be injurious to the public or contrary to the public good." *Walker v. Am. Fam. Mut. Ins.*, 340 N.W.2d 599, 601 (Iowa 1983). Yet declaring contracts unenforceable as violating public policy "is a delicate power which 'should be exercised only in cases free from doubt.'" *Wunschel L. Firm, P.C.*, 291 N.W.2d at 335 (quoting *Richmond v. Dubuque & Sioux City R.R.*, 26 Iowa 191, 202 (1868)). We will not "curtail

the liberty to contract by enabling parties to escape their valid contractual obligation on the ground of public policy unless the preservation of the general public welfare imperatively so demands." *Walker*, 340 N.W.2d at 601 (quoting *Tschirgi v. Merchs. Nat'l Bank of Cedar Rapids*, 253 Iowa 682, 690, 113 N.W.2d 226, 231 (1962)); *see also Robinson v. Allied Prop. & Cas. Ins.*, 816 N.W.2d 398, 408 (Iowa 2012) (" '[T]here is a certain danger in too freely invalidating private contracts on the basis of public policy.' . . . To do so 'is to mount "a very unruly horse, and when you once get astride it, you never know where it will carry you." ' " (alteration in original) (first quoting *Skyline Harvestore Sys., Inc. v. Centennial Ins.*, 331 N.W.2d 106, 109 (Iowa 1983)) (second quoting *Grinnell Mut. Reins. v. Jungling*, 654 N.W.2d 530, 540 (Iowa 2002))). And yet, in *Galloway v. State*, we held that "public policy precludes enforcement of a parent's preinjury waiver of her child's cause of action for [negligently inflicted] injuries" on an educational field trip. 790 N.W.2d 252, 253, 256, 258 (Iowa 2010). *But see Kelly v. United States*, 809 F. Supp. 2d 429, 437 (E.D.N.C. 2011) (anticipating that the North Carolina Supreme Court would enforce the parent's liability waiver for fifteen-year-old's high school enrichment program and describing *Galloway* as an "outlier").

Lukken argues that we should not enforce an exculpatory clause against him that purports to release claims of "any and all acts of negligence" as contrary to public policy to the extent it includes claims of gross negligence. While we have never provided an all-encompassing framework for analyzing public-policy exceptions, in *Baker v. Stewarts' Inc.*, we recited several factors that might be considered to determine whether a contract implicated a public interest. *See* 433 N.W.2d at 708. The district court in this case found that one of these factors—whether "the party seeking exculpation performs a service of great importance to

the public which is of practical necessity for at least some members of the public," *id.*—cut sharply against a finding that zip lining implicated a sufficient public interest to warrant interference with the parties' contract. The district court noted that the Iowa Court of Appeals in an unpublished opinion determined that snow sledding was a "purely recreational activity" and thus not a service of great importance or necessity to the public to justify applying the public-policy exception. *Lathrop v. Century, Inc.*, No. 01–1058, 2002 WL 31425215, at *3 (Iowa Ct. App. Oct. 30, 2002).

But this focus somewhat misconstrues Lukken's argument. Lukken's focus isn't on whether Mt. Crescent may enforce an exculpatory clause for voluntary recreational activities (under Iowa law, it may), but whether Mt. Crescent may enforce an exculpatory clause that negates claims for more culpable conduct. Lukken argues that the district court's ruling overlooks the differences between "ordinary" negligence and "gross" negligence, and thus overlooks the public-policy implications associated with the differences in the culpability of the conduct that he alleges.

In his summary judgment and appeal briefing, Lukken contends that gross negligence includes "wanton" conduct based on its description in Iowa Code section 85.20. That statute describes gross negligence as conduct "amounting to such lack of care as to amount to wanton neglect." Iowa Code § 85.20(2) (2018); *see also Thompson v. Bohlken*, 312 N.W.2d 501, 504 (Iowa 1981) (en banc). Lukken recites cases that define gross negligence similar to wanton conduct (and wanton conduct's close sibling, reckless conduct) as a basis for refusing to enforce contracts that include exculpatory clauses for gross negligence. Yet Lukken's argument—that his gross negligence claim includes wanton or reckless conduct—glosses over a distinction in our cases between our *common law* conception of gross negligence and different *statutory* renderings of gross negligence.

"Gross negligence" is not a distinct cause of action under our common law, but instead is a measure of conduct in a cause of action for negligence. *Unertl v. Bezanson*, 414 N.W.2d 321, 326–27 (Iowa 1987) (en banc). "In this state, as is well known, the actionable character of negligence is not dependent upon its 'degree,' and the ancient differentiation into 'gross,' 'ordinary,' and 'slight' has come to mean little more than a matter of comparative emphasis in the discussion of testimony." *Denny v. Chi., R.I. & P. Ry.*, 150 Iowa 460, 464–65, 130 N.W. 363, 364 (1911). Under our common law "there are no degrees of care or of negligence in Iowa," *Tisserat v. Peters*, 251 Iowa 250, 252, 99 N.W.2d 924, 925–26 (1959), and we thus do not recognize a tort cause of action based on "gross" negligence as distinct from "ordinary" negligence. *Hendricks v. Broderick*, 284 N.W.2d 209, 214 (Iowa 1979).

Yet analysis of "gross negligence" appears frequently in our cases interpreting statutes that employ the term. *See, e.g., Thompson*, 312 N.W.2d at 504 (interpreting the meaning of "gross negligence" in section 85.20); *Sechler v. State*, 340 N.W.2d 759, 761 (Iowa 1983) (en banc) (interpreting the meaning of "gross negligence" in section 306.41). In *Thompson v. Bohlken*, for instance, we analyzed the term "gross negligence" in section 85.20, which the statute describes as conduct "amounting to such lack of care as to amount to wanton neglect." 312 N.W.2d at 504 (quoting Iowa Code § 85.20 (1977)). We determined that the term "gross negligence" under this statute included elements requiring proof of the defendant's knowledge of the danger, the defendant's knowledge that injury is probable (not merely possible) to result from the danger, and the defendant's conscious failure to avoid the danger. *Id.* at 505. These elements generally track the definition of recklessness in the Restatement (Second) of Torts. *See Leonard ex rel. Meyer v. Behrens*, 601

N.W.2d 76, 80 (Iowa 1999) (per curiam) (relying on the definition of "recklessness" in the Restatement (Second) of Torts § 500, at 587 (Am. L. Inst. 1965)).

But we have warned that conceptions of "gross negligence" deriving from statutory uses of that term are not to be applied beyond those statutes. In *Sechler v. State,* a case tried before Iowa's adoption of comparative negligence, we defined gross negligence for purposes of Iowa Code section 306.41 (1983) as not to include wanton neglect. 340 N.W.2d at 761. We later stated that, "[f]ar from creating a new basis of liability, the 'gross negligence' discussed in *Thompson* was a restriction, not an expansion, of the scope of negligence suits." *Unertl,* 414 N.W.2d at 327. The notion of gross negligence as including "wanton" conduct under section 85.20 thus is "a concept limited by its terms to workers' compensation cases." *Id.* at 326–27.

As a result, Lukken's argument that common law gross negligence incorporates wanton or reckless conduct based on the description in section 85.20 doesn't square with our cases. The district court, reciting our cases stating that gross negligence is simply another degree of ordinary negligence, determined that the exculpatory clause releasing "any and all negligence" likewise released Lukken's gross negligence claims, and thus dismissed Lukken's claims against Mt. Crescent.

Lukken's confusion about how reckless or wanton conduct falls within the scope of gross negligence doesn't end the analysis in this case, however, because Lukken in his petition alleged that Mt. Crescent engaged in not only negligent conduct but also willful, wanton, and reckless conduct. We have long recognized separate grounds for tort liability based on these more culpable types of conduct. *See, e.g., Leonard ex rel. Meyer,* 601 N.W.2d at 80 (recognizing a cause of action in tort for reckless

disregard for safety); *see also Hendricks*, 284 N.W.2d at 214 (analyzing alleged reckless conduct separate from negligence).

Both the Restatements of Contracts and Torts disfavor exculpatory clauses that attempt to limit liability for harm caused recklessly or intentionally. Restatement (Second) of Contracts § 195(1), at 65 (Am. L. Inst. 1981) ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."); Restatement (Third) of Torts: Apportionment of Liab. § 2 cmt. *d*, at 20 (Am. L. Inst. 2000) (stating that generally "contracts absolving a party from intentional or reckless conduct are disfavored").

The Restatement (Second) of Torts notes that "[i]n the construction of statutes which specifically refer to gross negligence, that phrase is sometimes construed as equivalent to reckless disregard" of the interest of others. Restatement (Second) of Torts § 282 cmt. *e*, special n. 5, at 11. And so it has been in Iowa. Wanton conduct "involves the combination of attitudes: a realization of imminent danger, coupled with a reckless disregard or lack of concern for the probable consequences of the act." *Thompson*, 312 N.W.2d at 505. While willfulness is "characterized by intent to injure," wantonness is characterized by "indifference as to whether the act will injure another." *Id.* (citing 57 Am. Jur. 2d *Negligence* § 102, at 452–53 (1971)).

Many courts have considered in the same classification the concepts of wantonness, recklessness, and willfulness in declaring liability waivers unenforceable to the extent they seek to release such conduct. *See, e.g.*, *Wolfgang v. Mid-Am. Motorsports, Inc.*, 898 F. Supp. 783, 788 (D. Kan. 1995) (recognizing that under Kansas common law "any attempt to limit liability for gross negligence or willful and wanton conduct is unenforceable"); *Moore v. Waller*, 930 A.2d 176, 179 (D.C. 2007)

(recognizing that courts generally don't enforce exculpatory clauses limiting a party's liability for "gross negligence, recklessness or intentional torts" (quoting *Carleton v. Winter*, 901 A.2d 174, 181 (D.C. 2006))); *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981) (en banc) (holding that "in no event will such an [exculpatory] agreement provide a shield against a claim for willful and wanton negligence"); *Brady v. Glosson*, 74 S.E.2d 253, 255–56 (Ga. Ct. App. 1953) (holding an exculpatory clause unenforceable to relieve liability for willful or wanton conduct); *Wolf v. Ford*, 644 A.2d 522, 525 (Md. 1994) (stating that "a party will not be permitted to excuse its liability for . . . the more extreme forms of negligence, i.e., reckless, wanton, or gross"); *Anderson v. McOskar Enters., Inc.*, 712 N.W.2d 796, 801 (Minn. Ct. App. 2006) (stating that "any 'term' in a contract which attempts to exempt a party from liability for gross negligence or wanton conduct is unenforceable" (quoting *Wolfgang*, 898 F. Supp. at 788)); *New Light Co. v. Wells Fargo Alarm Servs.*, 525 N.W.2d 25, 30 (Neb. 1994) (holding that public policy prevents parties from limiting damages for "gross negligence or willful and wanton misconduct"). We conclude that, consistent with the great weight of authority, exculpatory clauses purporting to negate liability for acts that are wantonly or recklessly committed generally violate public policy.

We therefore hold that the contractual waiver limiting Mt. Crescent's liability is unenforceable to the extent it purports to eliminate liability for the willful, wanton, or reckless conduct that Lukken has alleged. To the extent Lukken's claims against Mt. Crescent involve culpability that constitutes only negligent conduct (regardless of any *degree* of negligence), his claims fail as a matter of law based on the liability waiver. Yet Lukken maintains the opportunity, notwithstanding the liability waiver, to pursue against Mt. Crescent his claims of willful, wanton, or reckless conduct.

We reverse the district court's summary judgment ruling as to Mt. Crescent and, in light of this determination, need not address the plaintiff's other arguments concerning the claims against Mt. Crescent in this appeal. We remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Appel, J., who concurs specially.

**APPEL, Justice (concurring specially).**

I cannot join the majority's overbroad duty analysis suggesting that because of lack of control, duty invariably evaporates. If the zip line was negligently constructed by Challenge Quest and a patron was injured as a result of the negligent design, a potential claim by the injured patron would not be defeated by a lack of duty. As noted by comment *g* of the Restatement (Third), section 49, a contractor no longer in possession "is subject to a duty of reasonable care as provided in § 7 for any risk created by the contractor in the course of its work." 2 Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 49 cmt. *g*, at 235 (Am. L. Inst. 2012). *See generally McCormick v. Nikkel & Assocs., Inc.*, 819 N.W.2d 368, 377–83 (Iowa 2012) (Hecht, J., concurring in part and dissenting in part) (describing the duty of care for contractors after relinquishing possession of land). The analysis after a contractor is no longer in control of the premises concerns the fact-based questions of whether the risk was within the scope of liability and causation, not the legal question of duty. *See generally Morris v. Legends Fieldhouse Bar and Grill, LLC,* 958 N.W.2d 817, 828–42 (Iowa 2021) (Appel, J., dissenting) (describing the proper analysis in most negligence cases rests with the fact questions of breach of duty and causation).

Generally, of course, these fact questions are not amenable to summary judgment. *See Thompson v. Kaczinski*, 774 N.W.2d 829, 832 (Iowa 2009). But here, causation is not present with respect to the design of the braking system itself as the allegedly defective Challenge Quest system was entirely replaced by another independent vendor. To the extent there was an equipment defect in the braking system (i.e. not having an emergency brake), it was the defect in the new braking system, and not

the original braking system, that caused the accident. And, the plaintiff showed no linkage between the unfortunate accident and the nebulous and allegedly insufficient training and safety policies, or the accident and the newly installed braking system (with a fundamentally different design from the original Challenge Quest system). So I concur in the district court's conclusion that any claim against Challenge Quest fails. But this is an oddball case tightly controlled by its facts that should not be decided based on the legal principles of duty.

I concur in the majority's holding with respect to the waiver of claims sounding in gross negligence.